**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Trading Technologies International, Inc.,<br>Plaintiff,<br>v.<br>BGC Partners, Inc.,<br>Defendant. | Civil Action No. 10-CV-715<br>Judge Virginia M. Kendall<br>Magistrate Judge Geraldine Soat Brown |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Trading Technologies ("TT") properly and timely served BGC Partners, Inc. ("BGC"), as is indicated in the proof of service filed with the Court. Despite the fact that BGC's parent company, Cantor Fitzgerald, contacted TT's counsel subsequent to service to seek an extension of the answer deadline based on receipt of the documents, at no point did BGC ever indicate prior to filing this motion that it had not received a copy of the summons. BGC was clearly on notice of the claims against it and has not offered evidence sufficient to overcome the affidavit of the process server, on which TT and the Court are entitled to rely. Therefore this Court should deny BGC's motion to dismiss for insufficiency of process and untimely service.

BGC's motion is also deficient with respect to its claims of lack of personal jurisdiction and improper venue.[1] First, much of the infringing conduct that took place in this district involved BGC's predecessor company, eSpeed, Inc. ("eSpeed"). BGC Partners, Inc., formed in 2008 through the merger of eSpeed and BGC Partners LLC, effectively stepped into the shoes of

[1] BGC's improper venue argument is solely based on lack of personal jurisdiction and therefore stands or falls with that argument.

its predecessor eSpeed and is subject to personal jurisdiction based on eSpeed's contacts with this jurisdiction. eSpeed was a named defendant in a related litigation in this district involving the same products at issue in the present case. (*Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, Civil Case No. 04-CV-5312; "the *eSpeed* case"). eSpeed's contacts with this district included sales of infringing software that were undisputed during the *eSpeed* case. The *eSpeed* case went to trial in late 2007, and the jury found that eSpeed infringed the patents-in-suit and awarded TT damages. BGC further confirmed that it had assumed eSpeed's position in 2008 when, in the context of a motion to stay judgment pending appeal, it represented that BGC would be able satisfy the judgment against *eSpeed*.

BGC has also consistently held itself out to the world as conducting business in Illinois. Among other things, both BGC's website and its filings with the SEC affirmatively identify an office of BGC Partners, Inc. in Chicago. BGC's website also indicates that BGC Partners, Inc. sells the accused software through its Chicago office. In addition, the phone number for the Chicago office is registered to BGC Partners, Inc. Therefore, BGC is subject to general and specific personal jurisdiction in this district, and the Court should deny its motion to dismiss.

## I. Factual Background

TT filed the instant suit naming BGC as a defendant on February 3, 2010. The filing was one of twelve (12) cases TT filed with respect to the patents-in-suit against various defendants during the first two weeks of February 2010. The last day for service pursuant to Rule 4 was June 3, 2010. As it had done in all the February cases, TT elected to defer service on BGC subsequent to the filing so it could explore settlement. TT attempted, to no avail, to engage BGC

in discussions to settle the pending case and the remaining issues in the related *eSpeed* case.[2]

While attempting to initiate settlement discussions, on May 18, 2010, TT requested that BGC accept service of the complaint. Ex. B (Decl. of S. Richard Carden) at ¶ 3. TT had successfully followed this course with numerous defendants in the other February cases. At no time did TT make a request of waiver of service under Rule 4(d), nor did it attempt to discuss formal waiver. BGC's counsel indicated he would not have a response before the next day, but asked whether TT would agree to 60 days for BGC to answer the complaint. *Id.* at ¶ 4. TT responded that it would not oppose an extension of time to answer until August 9, 2010, if BGC would agree to include the acceptance of service and the corresponding extension in a settlement non-disclosure agreement (designed to facilitate settlement discussions) that was being discussed by the parties. *Id.* at ¶ 5.

On May 20, 2010, BGC's counsel indicated that BGC would authorize him to accept service if TT consented to an extension until July 23, 2010 for its answer. Ex. B at ¶ 6. TT reiterated that if BGC was willing to agree to the proposed settlement non-disclosure agreement, TT still would not oppose an extension until August 9, 2010; otherwise, TT would not oppose a 30-day extension. *Id.* at ¶ 7.

On May 21, 2010, BGC proposed unnecessary language for inclusion in the proof of service document. Ex. B at ¶ 8. Up to this point, BGC had made no indication that it believed formal waiver was a necessity under Rule 4(d). *Id.*

---

[2] As noted above, in moving to stay the judgment in the *eSpeed* case, Defendant eSpeed, Inc. represented that BGC Partners, Inc. would satisfy the judgment. Ex. A at 3 ("[T]he Defendants' financial strength is beyond any dispute. Defendant eSpeed, Inc. (now known as 'BGC Partners, Inc.' after merging with an affiliated entity on April 1, 2008) is a publicly traded company listed on NASDAQ.")

On May 24, 2010, TT told BGC that it did not believe the language proposed was necessary, and reiterated that it would not oppose a motion by BGC to extend its answer deadline. Ex. B at ¶ 9. At this point, TT specifically indicated that, barring agreement to accept service, TT would simply move forward with formal service. *Id.* BGC responded by raising for the first time the issue of formal waiver under Rule 4(d) (which provides for sixty (60) days to answer), and suggesting in the alternative that the acceptance of service would have to be signed by BGC. *Id.* at ¶ 10. Because neither approach suggested by BGC was necessary[3], TT began the formal service process.

On May 24, 2010, TT contacted a process server via e-mail, enclosing copies of the summons, complaint, amended complaint and other documents filed in the present case. Ex. C (Decl. of Kirsten L. Thomson) at ¶ 3. The summons is listed in this e-mail under the file name "MBHB_1370199_1.PDF." *Id.* at ¶ 4. TT requested that the process server serve the documents attached to the e-mail, including the court-issued summons, upon the registered agent for the defendant. *Id.* at ¶ 5. On May 25, 2010, John A. Barber properly served BGC Partners, Inc.'s registered agent Scott LaScala at the address on file with Delaware's Department of State. *Id.* at ¶ 6. Mr. Barber subsequently executed a sworn affidavit stating that both the complaint and the summons were served. *Id.* at ¶ 7. This affidavit was executed on the return of service of the very summons BGC alleges was not served. *Id.* at Tab 3.

BGC's registered agent forwarded the documents served to BGC, and BGC apparently

[3] TT wanted to proceed in the same manner it had with other defendants. Rule 4(h) provides that a party may accept service upon an authorized agent. As is commonly done in many cases, TT was simply asking BGC to authorize its counsel to accept service in the mail from TT. For some reason, unbeknownst to TT, BGC did not agree to this simple request.

involved its parent company in the case.[4] On June 2, 2010, Tatiana Cashton, an employee of BGC's parent company Cantor Fitzgerald ("Cantor"), called TT's counsel regarding the deadline to file the answer to the complaint. Ex. B at ¶ 11; Ex. C at ¶ 8. TT's counsel returned the call on June 3, 2010 and left a voicemail. Ex. C at ¶ 9. Ms. Cashton returned the call on June 4, 2010, and Ms. Thomson explained that, as the summons states, the answer is due 21 days after the date of service. Ex. C at ¶ 10. Ms. Cashton asked if TT would oppose and extension of the answer for 30 days. *Id.* at ¶ 10. TT's counsel later again called Ms. Cashton regarding her request for an extension, and indicated TT would not oppose and extension until August 9 to respond, if BGC and Cantor would agree to TT amending the complaint to add Cantor as a Defendant. Ex. B at ¶ 12; Ex. C at¶ 11. At this point, Ms. Cashton informed TT's counsel that she was not an attorney and would have to forward the request to the attorney for whom she worked, Jennifer Bartle. Ex. B at ¶ 12; Ex. C at ¶ 11. TT requested that Ms. Cashton have Ms. Bartle call TT's counsel with a decision. In a subsequent call, Ms. Bartle, who then represented herself as in-house counsel for BGC, indicated that she was forwarding the matter to another attorney named Olga. Ex. C at ¶ 12. Neither Olga nor any counsel for BGC ever returned TT's call. Ex. C at ¶ 14. In none of these conversations did BGC ever represent that it had not received the summons. Ex. B at ¶ 13; Ex. C at ¶ 13.

**II. BGC Was Properly and Timely Served**

BGC's discussion of the negotiations between the parties regarding acceptance and/or waiver of service is not relevant, nor is BGC's conditional offer to accept service. TT was not

[4] Based on Cantor Fitzgerald's apparent control of the current litigation and of the BGC entities, TT will also seek to add Cantor as a defendant in the case.

required to seek formal waiver of service, but was able to serve formally at any time within the 120-day service period. Pursuant to Rules 4(c) and 4(h), TT provided a copy of the complaint, the amended complaint, the summons, and various associated filing documents to a process server by e-mail on May 24, 2010.[5] Ex. C at ¶ 3. On May 25, 2010, well within the 120-day service period, the process server served the documents on BGC's registered agent, as reflected in the affidavit of service filed with the Court. *Id.* at ¶ 6. As stated on the affidavit, Mr. Garber affirmed that he had served "the Summons and the complaint." *Id* at Tab 3. Both TT and the Court are entitled to rely upon the affidavit of the process server, which constitutes *prima facie* evidence of valid service that may only be rebutted by " 'strong and convincing evidence.' ". *Homer v. Jones*-Bey, 415 F.3d 748, 752 (7th Cir. 2005) (quoting *O'Brien v. R.J. O'Brien & Assoc., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993)). What might have happened to the documents after their delivery to the registered agent CTS (e.g. whether they were inadvertently or otherwise separated or misplaced by CTS personnel during the review) is not relevant.

Even assuming, *arguendo*, that the summons was missing and therefore service was not proper (which TT does not concede), dismissal is not appropriate in this case. First, at best there is a dispute about the facts of service, and in such cases, the dispute must be resolved in TT's favor. Second, BGC will suffer no prejudice in this case if service is deemed effective. BGC clearly was aware of the claims against it and knew how to obtain a copy of the summons. It had ample opportunities to request a copy of the summons from TT's counsel. The fact that it chose

---

[5] That BGC would even suggest that the service package was an indecipherable "mass of papers" is ridiculous. The package delivered comprised a total of 18 documents: the summons, the original complaint, an amended complaint, a notification of affiliates, an original and amended notice of claims involving patents, a minute order setting a status hearing, an initial status report, and several appearances.

not to, all the while trying to negotiate an extension of the answer date, and then refusing to return TT's calls regarding the requested extension, shows that BGC was merely trying to avoid service based on a fabricated hypertechnicality. BGC's conduct alone militates against granting BGC's motion to dismiss.

Finally, Rule 4(m) not only allows, but mandates, that TT be allowed extra time to serve. Rule 4(m) states:

> If a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant **or order that service be made within a specified time**. But **if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period**. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P 4(m). Rule 4(m) thus provides two separate mandatory provisions by which the Court must extend the time for service of process on BGC. In resolving BGC's motion, the Court may simply rule by granting TT extra time to serve, as opposed to granting the motion, even without a showing of good cause. However, if TT shows good cause, then the Court may not grant the motion to dismiss, but instead must allow extra time for service.

In this case, under either approach, the Court must grant extra time for service if it finds service was not proper. TT took every necessary step to ensure that BGC was properly and formally served. It sent all of the docket entries then existing, specifically including the summons, to a process server for service. Ex. C at ¶ 3-4. TT received back from the process server both the executed proof of service and an affidavit attesting to service of the summons specifically. *Id.* at ¶ 7. TT, therefore had every reason to believe that BGC had been properly served.

Moreover, neither BGC nor Cantor ever provided any indication to TT that they had not

received a summons, ***even when they were specifically asking for an extension of time to answer after they had been served***. Thus, TT moved forward with the case rightfully believing service had been effected. This constitutes a showing of good cause justifying an extension of the service date. This is precisely the purpose of the extension provision in the rule – to prevent a defendant from escaping litigation on a technicality that is subject to a factual dispute. To disallow extra time in view of the circumstances surrounding TT's formal service would be an injustice to TT; in contrast, allowing TT extra time to serve will not prejudice BGC. TT can and will serve the summons and the amended complaint immediately upon receiving an extension from the Court.

## III. BGC Is Subject to Personal Jurisdiction in this District, and Therefore Venue Is Proper

In a patent infringement case, Federal Circuit case law is controlling on the standard for determining whether personal jurisdiction exists. *Hildebrand v. Steck Mfg. Co., Inc.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002). To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff carries a weak burden, and need only make a *prima facie* showing that the defendant is subject to personal jurisdiction. *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003); *see also, e.g., Purdue Research v. Sanofi-Synthelabo, SA*, 338 F. 3d 773, 782 (7th Cir. 2003). As in any motion to dismiss, the court draws reasonable inferences in favor of the plaintiff. *See, e.g., SRAM Corp. v. SunRace Roots Enter. Co.,* 390 F. Supp. 2d 781, 783 (N.D. Ill. 2005); *Sotelo v. DirectRevenue, LLC*, 384 F.Supp.2d 1219, 1225 (N.D. Ill. 2005).

### A. BGC Is Subject to Personal Jurisdiction in this District as the Successor to eSpeed

In certain cases, the contacts of a predecessor corporation may be imputed to a successor corporation without offending constitutional due process requirements. *See, e.g., Purdue*

*Research v. Sanofi-Synthelabo, SA*, 338 F. 3d 773, 783-784 (7th Cir. 2003) (distinguishing between assignee, who would not assume contacts of assignor, and company that had merged with another, where the successor would assume contacts of predecessor). In this case, BGC has established very specific contacts with this district relevant to the instant case through its 2008 merger with eSpeed, Inc. ("eSpeed").

BGC Partners, Inc. was formed through the merger of BGC Partners LLP and eSpeed, Inc. *See, e.g.,* Ex. D at 6. As noted in BGC's 2009 Annual Report, BGC merged with eSpeed in large part because of its software offerings:

> On April 1, 2008, BGC Partners, LLC . . . merged with and into eSpeed, to form BGC Partners, Inc. The merger combined eSpeed's electronic marketplaces and related electronic trading technology expertise . . . with our inter-dealer brokerage businesses . . . . One of the primary motivations for our merger was our strategy of better focusing eSpeed's technology on supporting BGC Partners' brokerage services.

Ex. D at 6; *see also, e.g.,* at 78. As the report notes, BGC now provides trade execution capabilities through electronic trading software products, some of which are accused of infringement in this case.[6]

In 2004, TT sued eSpeed for infringement of related patents based on the same line of products at issue in this case (the "electronic trading technology" referred to in the annual report), and the case has recently come down from appeal with an affirmance of a jury verdict

---

[6] *See, e.g.,* Ex. D. at 5 ("We also provide a full range of services, including trade execution….Our integrated platform is designed to provide flexibility to customers with respect to price discovery, execution and processing of transactions . . . ."), 78 ("Management believes this combination will position BGC Partners as one of the few financial intermediaries with hybrid capabilities and technology thus allowing them to offer superior execution to its clients and drive higher trading volumes."); 114 ("The Company also provides a full range of services, including trade execution . . . to a broad range of financial and non-financial institutions.").

finding infringement and validity. *Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010). During the *eSpeed* litigation, it was not contested that the infringing eSpeed software was sold through eSpeed's Chicago office. Today, BGC continues to walk in eSpeed's shoes by offering in this district the specific software at issue in the *eSpeed* case, including the eSpeed platform and the Ecco software. Ex. E (sections from BGC's website). Moreover, in seeking a stay of the judgment in the *eSpeed* case, BGC acknowledged its assumption of eSpeed's technology and obligations by indicating that it would satisfy the judgment in the case. Ex. A at 3.

Thus, the merger of eSpeed into BGC is dispositive of the jurisdictional questions: the contacts of eSpeed with this forum must be imputed to BGC for purposes of establishing personal jurisdiction.

### B. BGC Is Subject to General Jurisdiction in this District Because it Has Established Systematic and Continuous Contacts with this District

BGC's arguments regarding personal jurisdiction in the Northern District of Illinois stand in stark contrast to its own practices and its own admissions in the very documents cited in the declaration of BGC's Senior Vice President and Deputy General Counsel, Michael A. Lampert. As detailed below, BGC has a presence in Illinois, which it admits in its own SEC filings and on its website. BGC also sells software in Chicago, which it admits in its own SEC filings and on its website. And rather than being simply "a holding company," BGC can and does exercise control over the BGC U.S. operating company which allegedly operates in Chicago, as it admits in its own SEC filings. Therefore, BGC is subject to both general and specific personal

jurisdiction[7] in this district, and its motion to dismiss for lack of personal jurisdiction and for improper venue must be denied.

BGC not only has the requisite minimum contacts to establish specific jurisdiction in Illinois, but BGC has "purposefully established minimum contacts with the forum state" that justify general jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Examples of BGC's contacts include:

- BGC maintains an office in Chicago, as indicated in its 2009 annual report and on its website, www.bgcpartners.com. *See, e.g.*, Ex. D at 5, 226 ("We have offices in…Chicago…."); 68, 227 ("Our U.S. operations also lease office space in…Chicago…."); 77, 114 ("BGC Partners has offices in…Chicago….");[8] Ex. E ("BGC's Chicago office currently has 9 staff. Previously an eSpeed office, the Chicago office was integrated into BGC following the merger of the two companies on April 1, 2008.").
- The phone number for the BGC Chicago office is apparently registered to BGC Partners, Inc., not BGC U.S. Ex. F.
- BGC sells the very software accused of infringement in this case in this district. *See, e.g.,* Ex. E ("BGC's Ecco software business is also based in Chicago. For more information on Ecco please visit: www.eccoware.com.").[9]

---

[7] This Court has recognized that conduct giving rise to the exercise of specific jurisdiction may exist when a company places goods into the stream of commerce, by way of distribution channels or otherwise, that it would reasonably expect to reach the forum. *See, e.g.*, *Murata Mfg. Co., Ltd. v. Bel Fuse Inc.*, 2004 U.S. Dist. LEXIS 19840, at *6 (N.D. Ill., Sept. 30, 2004); *accord Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994) ("[T]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.") (citations omitted).

[8] The terms "BGC Partners," "BGC," "we" and "our" have varying definitions throughout the annual report, but always include, at a minimum, BGC Partners, Inc., with or without its other affiliated companies.

[9] When the www.eccoware.com link is clicked, the user is redirected to the main website of BGC Partners, www.bgcpartners.com.

BGC's argument that it is merely a holding company, and that it conducts all U.S. operations through BGC U.S. (a/k/a BGC Partners, L.P.), fails to preclude an exercise of personal jurisdiction by this Court. While the mere condition of being a parent holding company to an entity which is subject to personal jurisdiction may be insufficient to establish jurisdiction over the parent, there are exceptions to this rule. Specifically, among other exceptions, exercising personal jurisdiction over the parent is appropriate where: (1) the parent company exercises unusual control over the subsidiary; (2) the subsidiary is acting as an agent of the parent, or (3) it is appropriate for jurisdiction to attach based on jurisdiction over a predecessor company. *Sotelo*, 384 F. Supp. 2d at 1226-1227; *Purdue Res. Found. v. Sanofi-Synthelabo S.A.*, 338 F.3d 773, 783 (7th Cir. 2003). As noted in the *Sotelo* case cited by BGC, the contacts of a subsidiary may be imputed to a parent corporation when the parent exercises an unusually high degree of control over the subsidiary. *Sotelo*, 384 F. Supp. 2d at 1225; *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). In this case, BGC touts its control over BGC U.S. throughout its 2009 annual report. For example:

> We hold the BGC Holdings general partnership interest and the BGC Holdings special voting limited partnership interest, which entitle us to appoint the general partner of BGC Holdings, and serve as the general partner of BGC Holdings, which entitles us to control BGC Holdings. BGC Holdings, in turn, holds the BGC U.S. general partnership interest and the BGC U.S. special voting limited partnership interest, which entitle the holder thereof to remove and appoint the general partner of BGC U.S, . . ., and serves as the general partner of BGC U.S. and BGC Global, ***all of which entitle BGC Holdings (and thereby us) to control each of BGC U.S. and BGC Global***.

Ex. D at 29 (emphasis added). The annual report details the exercise of that control:

> BGC Holdings is managed by its general partner. We hold the BGC Holdings general partnership interest and the BGC Holdings special voting limited

> partnership interest, which entitles us to control BGC Holdings and to remove and appoint the general partner of BGC Holdings.
>
> Under the BGC Holdings limited partnership agreement, ***we, as the BGC Holdings general partner, manage the business and affairs of BGC Holdings***.

*Id.* at 195 (emphasis added). The 2009 annual report later reiterates that BGC's control of BGC Holdings allows it to exercise control over BGC U.S., which it does:

> BGC U.S. and BGC Global each are managed by their general partner, which is BGC Holdings. BGC Holdings, in turn, holds the BGC U.S. general partnership interest and the BGC U.S. special voting limited partnership interest, which entitles the holder thereof to remove and appoint the general partner of BGC U.S. . . ., and serves as the general partner of each of BGC U.S. and BGC Global, ***which entitles BGC Holdings (and thereby BGC Partners) to control each of BGC U.S. and BGC Global . . . .***

*Id.* at 210.

BGC's control of BGC U.S. through BGC Holdings is further confirmed by the BGS US partnership agreement. Ex. G at Section 3.01 ("Subject to the terms and provisions of this Agreement, the management and control of this business and affairs of the Partnership shall be vested solely in, and directed and exercised solely by, the General Partner [in this case BGC Holdings]."). Therefore, even if the Chicago office and phone are maintained by BGC U.S. (which evidence demonstrates is not the case), and sales of the allegedly infringing products are made by BGC U.S., these contacts should be imputed to BGC based on its control over BGC U.S. This is not the mere level of control associated with ownership, but instead is day-to-day management and operation of the subsidiary, which gives rise to personal jurisdiction over BGC.

It is also clear from both BGC's motion and its latest annual report that BGC U.S. is nothing more than a shell for conducting the operations of BGC Partners, Inc. Where a subsidiary is merely acting as the agent of the parent, personal jurisdiction attaches. *IDS Life*

*Ins. Co. v. SunAm. Life Ins. Co.*, 136 F.3d 537, 541 (7th Cir. 1998). BGC U.S. is simply an agent of BGC Partners, Inc. Ex. D at 29 ("[O]ur business is operated through two operating partnerships, BGC U.S., which holds our U.S. businesses…."). Moreover, BGC Partners, Inc. exercises daily control over BGC U.S. through BGC Holdings.

Therefore, under any number of possible analyses, BGC has established the requisite minimum contacts to establish personal jurisdiction (both general and specific) in this district, and BGC's motion to dismiss for lack of personal jurisdiction must be denied. Because BGC's arguments with respect to improper venue rely solely on its failed personal jurisdiction arguments, this Court must also deny BGC's motion to dismiss for improper venue.[10]

Should the Court find that BGC's affidavits are sufficient to overcome TT's *prima facie* case of personal jurisdiction, as well as the evidence set forth in this opposition, TT should be allowed to take basic jurisdictional discovery with respect to BGC's motion to dismiss and then allowed to supplement its opposition following completion of discovery.[11] *Central States Southeast and Southwest Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 877-78 (7th Cir. 2006).

## IV. Conclusion

The evidence clearly demonstrates that BGC was properly and timely served in this case,

---

[10] In the worst case, this Court should allow TT to amend its complaint to add BGC Partners, L.P. (a/k/a BGC U.S.), BGC Holdings L.P. and Cantor Ftizgerald as defendants in this litigation (based on the representations in BGC's motion and its SEC filings), and grant TT time to formally serve these entities. To this end, TT will be filing a motion for leave to amend the complaint in the near future.

[11] BGC's 2009 Annual Report lists 147 different entities affiliated with BGC Partners, Inc. Ex. D at Exhibit 21.1. Among these are several eSpeed entities, and various versions of BGC USA. The report also states that BGC U.S. as used in the report is actually BGC Partners, L.P. *Id.* at 188. TT will require discovery to fully assess the contacts the various entities have with this district.

and therefore BGC has no basis for its Rule 12(b)(4) or 12(b)(5) motions and they must be denied. Moreover, BGC's affidavit regarding BGC's contacts with this district is insufficient to overcome the significant evidence that BGC has purposefully availed itself of this forum, both generally and specifically with respect to the subject matter of the pending suit. Thus, BGC's motions to dismiss for lack of personal jurisdiction and improper venue must also be denied.

Respectfully submitted,

Date: June 22, 2010

By: s/ S. Richard Carden

Leif R. Sigmond, Jr. (ID No. 6204980)
(sigmond@mbhb.com)
Matthew J. Sampson (ID No. 6207606)
(sampson@mbhb.com)
Michael D. Gannon (ID No. 6206940)
(gannon@mbhb.com)
S. Richard Carden (ID No. 6269504)
(carden@mbhb.com)
Jennifer M. Kurcz (ID No. 6279893)
(kurcz@mbhb.com)
Kirsten L. Thomson (ID No. 6293943)
(thomson@mbhb.com)
**McDonnell Boehnen Hulbert & Berghoff LLP**
300 South Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 913-0001
Fax: (312) 913-0002

Steven F. Borsand (ID No. 6206597)
(Steve.Borsand@tradingtechnologies.com)
**Trading Technologies International, Inc**.
222 South Riverside
Suite 1100
Chicago, IL 60606
Tel: (312) 476-1000
Fax: (312) 476-1182

**Attorneys for Plaintiff,**
**TRADING TECHNOLOGIES INTERNATIONAL, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS was served on the following by electronic service through the Court's ECF system and by e-mail on this 22nd day of June, 2010:

Gary A. Rosen
(grosen@logarpc.com)
**Law Offices of Gary A. Rosen, P.C.**
1831 Chestnut Street, Seventh Floor
Philadelphia, Pennsylvania 19103
(215) 972-0600

George C. Lombardi (glombardi@winston.com)
Andrew M. Johnstone (ajohnstone@winston.com)
**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

s/ S. Richard Carden