IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC. | Case No. 10 C 715 (Consolidated with: 10 C 716, 10 C 718, 10 C 720, 10 C 721, 10 C 726, 10 C 882, 10 C 883, 10 C 884 10 C 885, 10 C 929, 10 C 931) |
| Plaintiff, v. BCG PARTNERS, INC. |  |
| Defendant. | Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Trading Technologies, Inc. ("TT") sued GL Trade Americas, Inc. ("GL") alleging that GL's products infringe on certain TT patents relating to software for exchange trading (Case No. 10 C 716, since consolidated with 10 C 715). GL moved to disqualify TT's lead litigation counsel and in-house attorney Steven Borsand from this case as well as another case pending in this District, asserting that: (1) he has received, and will receive, confidential information concerning GL's litigation strategy by hiring Jerome Spaargaren, a London-based patent attorney previously engaged by GL's counsel; and (2) Borsand is a likely trial witness. For the below reasons, the Court denies GL's motion with respect to the first ground and denies it without prejudice as to the second ground.

I.   BACKGROUND

   A.   **GL's Factual Allegations and Evidence**[1]

      1.   EIP Engagement

According to GL, in December 2005 GL's outside counsel Alston & Bird LLP ("A&B") and Salans LLP (together "ABS") hired Spaargaren and his firm EIP Partnership LLP ("EIP") as consultants to help GL defend the infringement suit TT filed against GL in 2005 in Chicago ("2005 action"). GL contends that this engagement was not limited to a prior art search involving only publicly available documents, but rather that ABS discussed GL's defense strategy with respect to TT's patents with Spaargaren and EIP and provided EIP with GL's confidential information. GL also asserts that the EIP engagement included face-to-face meetings between ABS and Spaargaren and interviews of potential fact witnesses by EIP. GL further claims that between December 2005 and June 2008, A&B discussed counsel's work product concerning its defenses to TT's patents with Spaargaren and EIP. GL supports this contention with several heavily redacted emails between A&B and Spaargaren. Those emails demonstrate, at the very least, that even though Spaargaren was hired by—and was communicating with—A&B, he was aware that GL was A&B's ultimate client.

GL contends that EIP entered an appearance on TT's behalf in the opposition proceedings concerning the European counterparts to the 2005 patents-in-suit. GL also submits the declaration of Smeetesh Kakkad, one of its outside counsel. Kakkad filed a complaint against EIP and Spaargaren with the Intellectual Property Regulation Board ("IPReg"), the United Kingdom institution that regulates patent attorneys. (Doc. 95-1, Kakkad Dec. ¶¶ 2-3.) That complaint, which

---

[1] With the exception of the one declaration from one of GL's outside counsel stating that he filed an ethics complaint against Spaargaren and his firm, GL's allegations are not supported by sworn declarations or affidavits.

GL did not submit to the Court, "alleges that EIP has breached and continues to breach several rules of conduct" that apply to British patent attorneys "when EIP agreed to represent [TT] in matters directly adverse to GL, despite EIP's ongoing legal representation of GL." (*Id*. ¶ 3.)

### 2. TT's Relationship With Spaargaren

GL claims that in July 2010, TT engaged EIP to prosecute a number of TT's European patent applications and to assist TT in connection with an opposition proceeding in the European Patent Office ("EPO") concerning a patent application that corresponds to the patents-in-suit in the 2005 action. GL and TT are adverse in that EPO proceeding. Borsand and TT have informed GL that they will not end their engagement with EIP and Spaargaren.

### 3. Borsand as Inventor

According to TT's website, one of Borsand's responsibilities is to manage TT's intellectual property. He is the named inventor on a number of TT's patents, some of which claim priority from the same provisional application as the patents-in-suit.

## B. TT's Declarations and Other Evidence

TT submitted four declarations supporting its opposition: one from Borsand, one from Leif Sigmond, its lead outside counsel in this litigation, another from Mark Triplett, its vice president of patents, and the fourth from Spaargaren.

### 1. Borsand, Triplett and Sigmond Declarations

Borsand is TT's executive vice president of intellectual property. (10 C 716, Doc. 83-2, Borsand Dec. ¶ 1.) His job function is actively participate in all of TT's intellectual property litigation matters, including the instant action. (*Id.* ¶ 4.) Borsand is one of very few attorneys representing TT who has a full understanding of TT's broad intellectual property legal strategy. (*Id.*)

3

As TT's lead litigation counsel, Borsand regularly represents TT at hearings, depositions and trials. (*Id*. ¶ 5.) He is the only TT employee with experience and familiarity with TT's litigation matters and he is TT's only attorney in settlement and licensing negotiations. (*Id.* ¶¶ 5-6.) Since mid-2004, Borsand's involvement in TT's patent prosecution has been minimal and at a high level. (*Id.* ¶ 7.) He does not review any of the correspondence with the patent offices or review patent applications before they are filed. (*Id.*) TT's patent prosecution is headed by Triplett, who leads a team of in-house patent attorneys and manages TT's outside counsel with respect to patent prosecution. (*Id*. ¶ 8; Doc. 83-2, Triplett Dec. ¶ 4.) Borsand does not make decisions relating to product pricing, sales, marketing, design or development. (Borsand Dec. ¶ 13.)

Sigmond, TT's outside counsel, met Spaargaren at a party in London in June 2010 and asked TT if it would like to be introduced to Spaargaren and EIP. (Doc. 83-2, Sigmond Dec. ¶¶ 4-5.) Borsand has had just two contacts with EIP and Spaargaren. (*Id.* ¶ 17.) First, he, Sigmond and Triplett participated in an introductory phone pitch by Spaargaren regarding EIP's capabilities; during that call, Spaargaren assured the three that EIP had no conflicts that would prevent EIP from representing TT. (*Id*.; Triplett Dec. ¶ 7; Sigmond Dec. ¶ 7.) EIP did not disclose any GL confidential information during that call. (*Id.* ¶ 8; Triplett Dec. ¶ 12.) After receiving positive references, Triplett, not Borsand, made the decision to hire EIP and Spaargaren in August 2010 to assist TT with its patent prosecution in Europe, and Triplett, not Borsand, has been in communication with EIP regarding that work. (*Id.* ¶¶ 7-10; Borsand Dec. ¶ 14.) Borsand and Triplett had no knowledge about a relationship between EIP and A&B at the time TT hired EIP. (*Id.* ¶ 21; Triplett Dec. ¶ 9.)

4

Second, after ABS told Borsand about the potential conflict with GL in a September 2010 letter, Triplett and Borsand called EIP to discuss the potential conflict. (Triplett Dec. ¶ 12; Borsand Dec. ¶ 21.) During that call, Spaargaren again assured Triplett and Borsand that EIP had no conflict, that EIP completed a single project for A&B ending in 2006, and that EIP did not receive any confidential information from A&B's client over the course of that project. (Triplett Dec. ¶ 12; Borsand Dec. ¶ 21.)[2] Even though EIP disputed GL's allegations, out of caution TT ordered EIP to not work on the European counterparts and European opposition to the patents at issue in the 2005 action. (*Id.* ¶ 19; Triplett Dec. ¶¶ 14-15.) At that point, EIP had done little, if any, work on those filings and had not advised TT in any way concerning them. (Borsand Dec. ¶ 19; Triplett Dec. ¶¶ 14-15.) EIP withdrew from those particular proceedings, and TT left the balance of its European prosecution work with EIP. (Borsand Dec. ¶ 19; Triplett Dec. ¶¶ 14-15.) Borsand never received any of GL's confidential information from EIP. (*Id.* ¶ 22.)

Borsand has no current involvement with inventing TT's products. (*Id.* ¶ 11.) He is listed as an inventor on several patent and patent applications, but he has not invented anything since 2003. (*Id.*) All of his patents and applications spawned from filings made in 2003, and none of the patents on which Borsand is a named inventor are being asserted in any litigation or incorporated into any TT product. (*Id.* ¶¶ 11-12.) He had no inventive contribution to the provisional patent from which his patents claim priority. (*Id.* ¶ 12.) No new matter has been added to Borsand's patents or

---

[2]Borsand's declaration also states that during that call, Spaargaren told Borsand that EIP did not know the identity of A&B's client while engaged by the firm in 2006. (Borsand Dec. ¶ 17.) Spaargaren's declaration clarifies that while he told Borsand that he did not know who A&B's client was, and Spaargaren believed that to be true at the time he spoke to Borsand and Triplett, subsequent review of his files indicated that he knew that GL was the ultimate client. (Spaargaren Dec. ¶ 13 n.1) This is consistent with the heavily redacted emails submitted by GL.

5

applications since 2003, and all more recent filings are continuations of that original 2003 filing. (*Id*. ¶ 11.)

        2.       <u>Spaargaren's Declaration</u>

Spaargaren is an EIP partner. (Doc. 107-1, Spaargaren Dec. ¶ 4.) In December 2005, A&B approached EIP to perform prior art searches for the patents-in-suit in the 2005 action. (*Id.* ¶ 13.) At that time, EIP did not know who A&B's client was. (*Id.*) EIP completed the prior art searches, and made initial contact with a few individuals who might know something about that prior art. (*Id.*) Philippe Bennett, GL's counsel in the instant case, took over the investigation after that initial contact. (*Id.*) The "vast majority" of EIP's file on the A&B matter are reports to Bennett; the information EIP received from A&B was limited to information that would have been available from public sources. (*Id.*) Aside from those communications, Spaargaren and his assistant met with Bennett and Lara Moffatt, also counsel to GL in the instant suit, once in London five years ago. (*Id.*) That meeting was brief and without any substantive discussion. (*Id.*) According to Spaargaren, "at no stage did Mr. Bennett or Ms. Moffatt share with us their thinking on GL's defence and litigation strategies." (*Id.*) A&B's relationship with EIP was "entirely at arm's length." (*Id.*) At the time EIP ran the prior art searches, it was unaware that in January 2006, GL became party to the opposition to the European equivalent of one of the patents-in-suit in the 2005 action. (*Id.*)

EIP's last substantive contact regarding the project with A&B was in October 2006, and the relationship was not ongoing between October 2006 and August 2010. (*Id.* ¶¶ 14-16.) In June 2008, Spaargaren exchanged emails with an attorney at A&B, Walter Scott, entitled "Re-connecting" regarding general questions concerning British patent law. (*Id.* ¶ 15.) In an effort he describes as an "attempt at encouraging new work," one email mentioned that Spaargaren had talked to one of

the patent examiners involved in the European opposition to TT's patent and offered to pass along any information to A&B. (*Id.*) Scott did not respond to that offer. (*Id.*) EIP's other contacts with A&B since October 2006, none of which concern the prior art searches for GL, were:

- a January 2007 "goodwill" visit by one of Spaargaren's colleagues to A&B's offices in New York to encourage new work;

- other general inquiries from Scott on British patent law;

- a prior art search for another A&B client not connected with GL;

- inquiries to maintain EIP's mailing list.

(Id. ¶ 16.) According to Spaargaren, GL has not been a client of EIP's since 2006. (*Id.*)

Spaargaren confirms Borsand's, Triplett's and Sigmond's declaration regarding how TT retained EIP. (*Id.* ¶ 17.) At the time TT engaged EIP, it did not occur to Spaargaren to tell TT about the previous work for A&B because that project concerned searches of public documents and was discrete and limited. (*Id.* ¶ 18.) EIP entered a blanket appearance in the EPO on TT's behalf in all proceedings involving TT's patents, which is standard practice in Europe. (*Id.* ¶ 19.) Once TT told EIP to withdraw as to the European equivalents of the two patents identified by A&B, EIP withdrew and returned the files regarding those patents to TT's previous counsel unopened. (*Id.* ¶ 20.)

### C. IPReg Decision

On December 20, 2010, after investigation of Kakkad's complaint, IPReg's "Complaints Review Committee" found that: (1) GL failed to establish a breach by EIP of the applicable rules regarding maintaining client confidences; and (2) EIP "may have" committed a prima facie breach of the rule against representing a new client adverse to an old client concerning the same subject matter. (*See* Doc. 115-1.) Specifically, the committee noted that GL did not

> identify in detail the information which is alleged to be confidential together with an explanation as to how the confidential information is alleged to have been used . . . In the Committee's view it is wholly inadequate to content that a breach of the Code of Conduct arises solely on the basis of there being a risk that unparticularised information supplied by a client might at some time be made available to another.

(*Id.* at 5.) The committee found EIP's alleged breach of the prior representation rule was "technical" and "entirely accidental." (*Id.* at 7.) "Given the limited nature of [sic] prior connection between [GL] and [EIP]," the committee reasoned, "it was not unreasonable for the conflict not to be immediately apparent when [EIP] accepted the instructions from TT." (*Id.*) The committee declined to press the case further in light of EIP's "prompt and proportionate action to deal with the breach." (*Id.*) On April 5, 2011, the committee submitted a revised opinion incorporating its previous decision regarding the alleged breach of confidentiality and concluded that GL had not established any ethical breach by EIP. (*See* Doc. 159-1 at 9.)

## II. DISCUSSION

### A. Disqualification Standard

Disqualification of counsel "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir. 1982) (noting that motions to disqualify should be "viewed with extreme caution for they can be misused as techniques of harassment"); *see also Commonwealth Ins. Co. v. Stone Container Corp.*, 178 F. Supp. 2d 938, 943 (N.D. Ill. 2001). It is GL's "heavy burden" to disqualify Borsand as TT's chosen counsel. *Id.*

GL asserts that the confidential information Spaargaren received as a result of his representation of GL (through A&B) has been passed along to Borsand. In cases where a lawyer has represented one client, only to "switch sides" to become adverse to that client later, the Court asks

8

three questions: (1) whether a substantial relationship existed between the old matter and the new; (2) whether the lawyer rebutted the presumption of shared confidences as to the prior representation; or (3) whether the lawyer rebutted the presumption of shared confidences for the current respresentation. *See e.g., United States v. Goot*, 894 F.2d 231, 234-35 (7th Cir. 1990); *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983) (same); *LaSalle Nat'l Bank v. Cty. of Lake*, 703 F.2d 252, 256 (7th Cir. 1983) (noting that presumption that an attorney received confidential information during his prior representation is rebuttable). Though GL cites the three-part test, GL asserts that Spaargaren's representation of GL, and then TT, is analogous to cases where an attorney has been disqualified because he hired an expert witness who consulted with opposing counsel in a previous case. *See e.g., Cordy v. The Sherwin-Williams Co.*, 156 F.R.D. 575, 583 (D. N.J. 1994) (asking if the expert received confidential information in discussions with opposing counsel and whether he divulged it to his attorney). At least one court in this District has found that the *Goot* test is widely applicable. *See Coburn v. DaimlerChrysler Services N. Am., L.L.C.*, 289 F. Supp. 2d 960, 964 (N.D. Ill. 2003) (holding the three part test is "applies with equal force to non-lawyers"). However the standard is articulated, it is clear the central question in any disqualification motion is whether the attorney in question received confidential information that puts the opposing party at a disadvantage. *See Freeman*, 689 F.2d at 721 (noting "[a] fundamental principle in the lawyer-client relationship is that a lawyer shall maintain the condientiality of the information relating to the representation.")

### B. GL's Confidential Information

Because Borsand was not GL's lawyer, GL must establish first that Spaargaren and EIP had access to GL's confidential information, and that, in turn, Spaargaren and EIP disclosed that confidential information to Borsand. That transfer is assumed unless rebutted. *See LaSalle Natl'l*

*Bank*, 703 F.2d at 256. TT has rebutted that presumption with unchallenged declarations. Spaargarden states that he received no confidential information from A&B and its client GL. According to Spaargarden, A&B never discussed its trial strategies or any other work product concerning GL with EIP. Further, Borsand states that he received no confidential information regarding GL from his two limited contacts with EIP. Though GL suggests the Court should review A&B correspondence with EIP *in camera* to see that it, in fact, A&B sent confidential information to EIP, GL submits no sworn statements rebutting any of Spaargaren's or Borsand's statements. Indeed, even though GL's counsel in the instant case was the attorney who engaged EIP and was one of the primary contacts with Spaargarden, GL provides no declaration stating that GL's counsel provided confidential information to Spaargaren or EIP.[3]

According to GL, Borsand must be disqualified because it is impossible for him to know whether he received GL's confidential information from Spaargaren, and whether, and to what extent, his thinking has been unconsciously affected by that information. *See Cordy*, 156 F.R.D at 584 (finding "[t]here is an inherent difficult in determining, at some later time, whether [the attorney received confidential information.]"); *Micron Tech., Inc. v. Mosel Vitelic Corp.*, 98-0293, 1999 WL 458168, at *6 (D. Idaho Mar. 31, 1999 (finding, in the context of a protective order, "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so") (internal citation omitted). Setting aside that Spaargaren's uneqivocal statment that he had nothing confidential to pass along to Borsand,

---

[3] The IPReg committee also faulted this failure to substantiate the claim that EIP received and passed on GL's confidential information.

GL's assertion is at odds with controlling caselaw and the other unchallenged facts of EIP's relationship with TT and GL (through A&B).

First, the Seventh Circuit's three-part test explicitly provides that an attorney may rebut the presumption that s/he received confidential information. *See LaSalle Nat'l Bank*, 703 F.2d at 256. An attorney could never rebut the presumption that s/he received confidential information if courts assumed that s/he cannot determine where confidential information ends and non-confidential information begins. Second, Spaargaren's and Borsand's statements that they received no confidential information from GL are not unadorned conclusions. Both Spaargaren and Borsand provide detailed declarations demonstrating why those statements are consistent with EIP's relationship with A&B (as to Spaargaren) and EIP's relationship with TT (as to Borsand). Prior art searches are concerned with publicly available information, and may be completed with only an existing application or patent (both public, of course). Indeed, A&B hired EIP to without first telling EIP who the ultimate client was, and A&B stepped in when these prior art searches moved from searching public documents to consideration of that prior art in connection with the 2005 action and European opposition. As to EIP's relationship with TT, and Borsand in particular, it is reasonable that EIP did not pass GL's confidential information to Borsand in the initial pitch call or when EIP became aware of GL's allegations. Further, though TT initially engaged EIP to handle all its European patent prosecution, TT sent its work on the European equivalents of the 2005 patents-in-suit—the patents A&B asserted EIP touched—to different firm. In other words, TT removed EIP from the litigation where confidential information that EIP received, if any, could

arguably help TT.[4]  Borsand's statement that he received no confidential information is consistent with TT's precautions and his very limited contacts with EIP.

### C. Borsand as a Trial Witness

Finally, GL asserts that Borsand should be disqualified as counsel because he will be a witness at trial. The local rules provide that an advocate may testify if called by the client where: (1) the testimony relates to an uncontested matter; (2) the testimony is a formality and there will be no substantial evidence offered in opposition; (3) the testimony concerns the nature and value of legal services provided by the attorney; or (4) "as to any other matter, if refusal to act as an advocate would work a substantial hardship on the client." L.R. 83.53.7(a); *see also Mercury Vapor Processing Techs., Inc. v. Vill. of Riverdale*, 545 F. Supp. 2d 783 (N.D. Ill. 2008) (noting Local Rule 83.53.7 governs the issue of lawyers as witnesses). If the lawyer will be called by a party other than his or her client, the lawyer may act as an advocate "unless the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client." L.R. 83.53.7(b). GL asserts that Borsand testified at the trial of TT's claims against eSpeed, Inc. in 2007, that Borsand is a named inventor on several of TT's patents that claim priority from the same provisional application as the patents in suit, and that Borsand will give testimony concerning prior use of patented technology that is "expected" to be prejudicial to TT. According to GL, both Borsand's patents and the patents-in-suit concern graphical interfaces and particular ways that market information is displayed to the user.

---

[4] GL also claims that EIP will be able to obtain patents by "strategically claiming around prior art that EIP has knowledge of only because of its relationship with GL." (Doc. 95, Rep. at 8.) That argument both unpersuasive and beside the point. Prior art is not a secret known only to EIP - it is available to everyone by definition. Also, how TT obtains additional patents in the future is not at issue in this case for infringement of patents already issued.

GL's motion is premature. At this time, the Court and the parties do not know what discovery will show or what disputes of fact will be presented to a jury. Indeed, GL has not answered the complaint, having moved to dismiss it for failure to state a claim. Further, it is not clear how Borsand has been involved with the patents-in-suit or how his patents overlap or fit in with the patents at issue. In short, the Court cannot answer either of the two crucial inquiries under Local Rule 83.53.7: (1) whether Borsand will testify; and (2) whether that testimony would be prejudicial to TT. The Court will not disqualify Borsand and deprive TT from its choice of counsel based on what may, or may not, occur in the future. *See Freeman*, 689 F.2d at 721 (limiting disqualification to instances where it is absolutely necessary). What is clear at this point is that Borsand is not listed as a named inventor on the patents-in-suit, and he has suggested, albeit cryptically, that his role as inventor on his patents was the result of "happenstance." If discovery reveals that Borsand will be called as a witness at trial, GL may renew its motion on this ground and the Court will evaluate at that time whether he should be disqualified under Local Rule 83.53.7.

### D. Borsand As Inventor

As GL notes, Borsand is listed as an inventor on at least some of TT's patents. Though those patents are not at issue in this suit, the 2005 action, or any other litigation, GL is concerned that as trial counsel, Borsand will have access to GL's confidential information and use it to invent new technology. GL points to patent applications bearing Borsand's name filed in 2006 and as late as April 2010 to question Borsand's declaration. That declaration states that he has not invented anything for TT since 2003 and that all his more recent filings are continuations of his 2003 filings.

Protective orders in patent litigation often allow for employees of the parties to participate in the proceedings but restrict their access to certain highly confidential information. Theoretically, Borsand's role as an inventor would be a reason to restrict his access to certain types of information, but would not a reason to impose the drastic measure of disqualification. GL's worry about Borsand's access to confidential information has been properly addressed in detail by Magistrate Judge Schenkier's recent opinion granting TT's motion for a protective order in this case (*see* Doc. 166) as well as his opinion in the 2005 action. *See Trading Techs. Int'l, Inc. v. GL Consultants Inc.*, No. 05 C 4120, 2011 WL 148252 (N.D. Ill. Jan. 18, 2011).

### III.   CONCLUSION

For the foregoing reasons, GL's motion to disqualify Borsand (Case No. 10 C 716, Doc. 73) is denied. If after fact discovery closes GL, in good faith, believes that Borsand is likely to testify and that his testimony will prejudicial to TT, GL may renew its motion on that ground.

                                                                                   _____
                                                                                   Virginia M. Kendall
                                                                                   United States District Court Judge
                                                                                   Northern District of Illinois

Date: May 5, 2011