IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | )<br>)<br>) |
| *Plaintiff,* | )<br>) No. 10 C 715<br>) |
| v. | )<br>) Judge Virginia M. Kendall<br>) |
| IBG LLC AND INTERACTIVE BROKERS LLC, | )<br>)<br>) |
| *Defendants.* | )<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Trading Technologies International, Inc. ("TT") sued Defendants IBG LLC and Interactive Brokers Group LLC (collectively "IBG") for infringement of United States Patent Nos. 6,766,304 (the "'304 Patent"), 6,772,132 (the "'132 Patent"), 7,676,411 (the "'411 Patent"), and 7,813,996 (the "'996 Patent"). The Court held a claims construction hearing, at which time it heard argument on IBG's Motion to Strike (Dkt. 1126) and the five claim terms in dispute. (Dkt. 1136). For the reasons stated within, IBG's Motion is granted, and the Court's construction of these terms is set forth below.

## BACKGROUND

The patents at issue here are related to electronic trading systems and software. The four patents asserted are from the same patent family, titled "Click Based Trading with Intuitive Grid Display of Market Depth." TT suggests that its

family of patents and the software it developed made significant improvements on existing trading software by providing a faster, more efficient means of trading by incorporating a static price axis and a dynamic display of bid and ask indicators that move along a static price axis as market information changes. TT argues that IBG's Trader Workstation, WebTrader, and BookTrader products and modules infringe upon their trading software patents.

## LEGAL STANDARD

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The construction of the claims at issue is a legal determination to be made by the court. *See id.* (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)). Generally, the terms of a claim are given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When interpreting an asserted claim, the court looks first to intrinsic evidence: the words of the claims, the patent specification, and the prosecution history. *See id.* at 1316-18.

The claim language is the starting point for claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *See Sumitomo Dainippon Pharma Co., Ltd. v. Emcure Pharmaceuticals Limited,* 887 F.3d 1153, 1157-58 (Fed. Cir. 2018); *Robotic Vision Sys., Inc. v. View Eng'g Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1997). In some cases, the "ordinary and customary" meaning of

the claim language may be readily apparent, even to lay judges, and the court applies the widely accepted meaning of the commonly understood words. *See Phillips*, 415 F.3d at 1314. In such cases, a general-purpose dictionary may be helpful. *See id.* In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *See id.* at 1314-15. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is usually dispositive; "'it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In the specification, the patentee provides a written description of the invention that allows a person of ordinary skill in the art to make and use the invention. *See id.* at 1323. At times, the patentee uses the specification to "set forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The court may also look to the patent's prosecution history. *See Phillips*, 415 F.3d at 1317. While the prosecution history often lacks the clarity of and is less useful than the specification, it may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention as well as how the inventor may have limited the scope of the invention. *See id.* The prosecution history is generally relevant if a particular interpretation of the claim was considered and

specifically disclaimed during the prosecution of the patent. *See Schumer v. Lab. Comp.* Sys., 308 F.3d 1304, 1313 (Fed. Cir. 2002).

Finally, a court may also consult "extrinsic evidence," such as dictionaries, treatises, and expert testimony, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317-18. Generally, extrinsic evidence is "less reliable" than intrinsic evidence and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. With respect to the use of dictionaries, technical or general, a court may consult such evidence "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

## **DISCUSSION**

### I. **IBG's Motion to Strike**

Before addressing the merits of the claim construction, the Court first turns to IBG's Motion to Strike the Declaration of Larry S. Nixon, TT's expert. (Dkt. 1124). IBG claims that Nixon's declaration is improper because Nixon does not have technical skill in the art, it contains improper legal argument, and it contains factual and legal fallacies. (Dkt. 1126). The "'[a]dmission of expert testimony is within the discretion of the trial court.'" *Sundance, Inc. v. DeMonte Fabricationg Ltd.,* 550 F.3d 1356, 1360 (Fed. Cir. 2008) (quoting *Acoustical Design, Inc. v. Control Elecs. Co.,* 932 F.2d 939, 942 (Fed. Cir. 1991). At the claim construction stage, the primary consideration for the Court is whether additional expert testimony is helpful in interpreting the meaning of the contested claim language. *See e.g., Senior Indus.,*

*Inc. v. Thomas & Betts Corp.,* 2001 WL 1163680, at *3 (N.D. Ill. Sept. 8, 2001), aff'd 79 F.App'x 427 (Fed. Cir. 2003) (citing *Markman*, 52 F.3d at 983).

Here, TT offers Nixon as a patent office procedure expert. (Dkt. 1157, 130:21-23). In his declaration, Nixon opines on the prosecution histories of the patents at issue, USPTO patent application and prosecution procedures, and the definition of certain terms based upon prior litigation and the intrinsic record. To the extent that Nixon offers his own interpretation and legal conclusion of prior *eSpeed* litigation (Dkt. 1075-2, Part III), his declaration is stricken as improper. *See e.g., The Medicines Co. v. Mylan Inc.,* 2014 WL 1758135, at *6 (N.D. Ill. May 2, 2014) ("She may not, however, give general testimony interpreting patent law."). The remainder of Nixon's declaration provides an in-depth summary of the USPTO's procedures and the file history of these specific patents. Though there is nothing inherently improper regarding an expert's testimony covering such topics, there is likewise nothing inherently helpful about it either. The Court is familiar with the relevant patent law procedures and is more than capable of understanding the patents' file histories. As such, Nixon's testimony is not necessary to the Court's core mission at this stage—claim construction—and Nixon's testimony is stricken as not relevant and cumulative. *See Markman,* 52 F.3d at 983.

## II. "static price axis" ('996 Patent; claim 1)

| IBG's Proposed Construction | TT's Proposed Construction |
|---|---|
| "a line comprising price levels that do not change positions unless a manual re-centering command is received" | "a reference line comprising price levels that do not change positions unless a re-centering or re- positioning command is received." |

With respect to the term "static," the parties devoted significant time in their briefs and at oral argument to the meaning, and controlling nature, of previous related litigation—*Trading Techs. Int'l, Inc. v. eSpeed, Inc.,* 595 F.3d 1340 (Fed. Cir. 2010) and *Trading Techs. Int'l, Inc. v. Open E Cry, LLC,* 728 F.3d 1309, 1312 (Fed. Cir. 2013). *eSpeed* dealt with the '132 and '304 Patents and, potentially relevant here, the construction of "static" in those patents. There, the Federal Circuit affirmed the district court's construction of "static" as a line or display of price levels "that do not change positions unless a manual re-centering command is received." *eSpeed,* 595 F.3d at 1352 (citations omitted). *Open E Cry* again concerned the term "static," but this time in the context of the '055 Patent. The relevant question in *Open E Cry* was whether the factors that led to the court's construction of "static" in the '132 and '304 Patents equally applied and carried through to the '055 Patent, requiring an identical construction, merely because the '055 Patent uses the same term. *Open E Cry,* 728 F.3d at 1322-23. The Federal Circuit answered that "static" in the '055 Patent did not necessarily require the same construction as the '132 and '304 Patents. *Id.* at 1323. Instead, "the intrinsic record specific to the '055 Patent distinguishe[d] *eSpeed* and compe[lled] a different result"—notably a construction not limited to manual re-centering. *Id.* Neither of these prior cases, nor this Court's summary judgment ruling relied upon by IBG, considered, or applied to, the '996 Patent currently in question.

The core dispute with respect to the "static price axis" term is whether the term should be read to be limited to "manual" re-centering. As previewed above, IBG asserts that this question has already been answered in the affirmative by the

Federal Circuit in *eSpeed*. *See* (Dkt. 1047, pg. 15). Indeed, the district court construed, and the Federal Circuit affirmed that, as to the '132 and '304 Patents, the claim required a manual re-centering command. *eSpeed,* 595 F.3d at 1354. However, as highlighted by *Open E Cry,* the construction of a term is specific to the intrinsic record of the corresponding patent and therefore, identical terms may have varying constructions when considered in light of their respective intrinsic records. *Open E Cry,* 728 F.3d at 1323. Thus, in construing terms for the '996 Patent, the Court is not restricted to how those terms were construed in other contexts.

Here, the intrinsic record and prosecution history of the '996 Patent warrant a different construction of "static price axis" than that seen in the '132 and '304 Patents. The '996 and '382 Patents are closely related and were even prosecuted at the same time and before the same examiner. Their relatedness is instructive here. Similarly, at issue in the '382 Patent was the term "static." There, the examiner embraced a broader interpretation of the term than adopted by the *eSpeed* court.

> The Examiner acknowledged that the term 'static' is not limited to situations where the price levels do not change positions unless a *manual* recentering command is received, but includes situations where the price levels change positions in response to either a manual (under the control of the user) or automatic (outside of the user's control) re-positioning command.

TTAppx2 (emphasis in original). And nearly ten years ago, in the context of the '996 Patent prosecution, TT submitted Comments on Allowance memorializing the understanding of TT and the examiner. Appx391-393. Again, it was clear that "static" in the '996 Patent was to be understood in a broader sense than the '132 and '304 Patents.

> The intrinsic record has been further developed since the issuance of the '132 and '304 patents. In the present case, as in the '382 patent, neither Examiner nor Applicant limited the term 'static' to the narrow meaning adopted by the courts in connection with the '132 and '304 patents. To the contrary, it has been understood, as confirmed by various discussions with the Examiner throughout the examination of this family of cases, including the present application, that a 'static' price axis may include a mode or condition in which there *is* a possibility that the price levels change positions automatically… This understanding is founded on the specification, which states that the price levels 'do not normally change positions unless a recentering command is received…'

Appx392. Though these Comments were prepared by TT, there is no evidence in the voluminous record that the examiner ever objected to TT's memorialization of the understanding between it and the examiner. Indeed, this understanding by TT and the patent examiner is highly relevant given that it occurred during the prosecution of the patent and a patent applicant's understanding of its own terms is especially probative. *See Intergraph Corp. v. Intel Corp.,* 89 F. App'x 218, 225 (Fed. Cir. 2004) ("A patentee may, of course, act as his own lexicographer and define a claim term in either the specification or the prosecution history.") (citing *Mycogen Plant Sci., Inc. v. Monsanto Co.,* 243 F.3d 1316, 1327 (Fed. Cir. 2001)).

The prosecution history here teaches that the '996 Patent is meaningfully different than the '132 and '304 Patents and their prior construction in the *eSpeed* litigation. And consistent with the *Open E Cry* decision, this Court need not adopt those constructions sight-unseen. *See Open E Cry,* 728 F.3d at 1323. A plain reading of the '996 Patent specification and associated prosecution history reveals that the term "static price axis" contemplates something more than manual re-centering.

IBG's proposed construction would unnecessarily read-in a limitation to the claim language by attempting to define a "static price axis" by referencing how it recenters. The Court adopts TT's proposed construction of "static price axis."

### III. The moving indicator terms

| Claim Term/Phrase | IBG's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "at least one of the first and second indicators moves … relative to the common static price axis" ('304 Patent; claims 1 and 27) ('996 Patent; claim 1) | "the location of at least one of the highest bid or lowest ask quantity is changed to a different location, ascending or descending relative to the common static price axis" | Plain and ordinary meaning |
| "moving the first [second] indicator relative to the price axis to a second graphical location of the plurality of graphical locations" ('411 Patent; claims 1 and 26) | "the location of the highest bid [ask] quantity is changed to a different location, ascending or descending relative to the price axis" | Plain and ordinary meaning |

The parties next dispute the construction of a pair of "indicator" terms found in the '304, '996, and '411 Patents. IBG proposes a lengthy construction while TT suggests that no construction is necessary and that the terms be given their plain and ordinary meaning. At its crux, IBG's proposed construction attempts to limit the broader term, "indicator," to "quantity" in each of its proposed constructions. Though the Court must be mindful of a jury's ability to dissect claim construction rulings, *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010), IBG's proposed constructions would only serve to muddy the waters by reading in a

limitation to the term. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004). Where a claim has a clear and ordinary meaning on its face, the Court's construction inquiry ends. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1361 (Fed. Cir. 2013); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,* 694 F.3d 1312, 1326 (Fed. Cir. 2012).

Moreover, IBG's proposed construction is not supported by the record. The claim language itself reads "…the first indicator representing quantity associated with at least one order…" Appx803, 12:45. A cursory review of the patent leaves no doubt that the indicator *represents* a quantity and *not* that the indicator *is itself* a quantity. IBG's construction would blatantly ignore the claim language. While the indicator could very well be a quantity, it may manifest itself in other ways (e.g., color, shape, marker, etc.). Additionally, Judge Moran previously construed the term "indicator" in a separate case involving the '132 and '304 Patents. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.,* 2006 WL 3147697, at *7 (N.D. Ill. Oct. 31, 2006). The defendant there similarly attempted to restrict the construction of indicator to a quantity, but Judge Moran declined that invitation and instead "construe[d] 'indicator' in its plain and ordinary meaning as 'something that indicates.' *Id.* Likewise, here, IBG's attempt to confine the understanding of indicator to a quantity

or numerical value flies in the face of the clear claim term language and is impermissible. *See Liebel-Flarsheim Co.,* 358 F.3d at 913.

IBG's construction is also fatally inconsistent with the record when viewed in the context of the "moves" terms. IBG's proposed construction of the term would require that a specific numerical value on the axis change to an ascending or descending location on the axis. Such a construction would only be able to stand if "indicator" was truly limited to a quantity. Nevertheless, IBG's proposal misses the mark. The item changing or moving over time in the Patents is not the quantity associated with the bid and ask price, but the indicator itself. *See e.g.,* Appx64-65. Finding otherwise would contradict the preferred embodiment found in the specification. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC,* 815 F.3d 747, 755 (Fed Cir. 2016) ("We have often remarked that a construction which excludes the preferred embodiment is 'rarely, if ever correct.'") (quoting *Vitronics,* 90 F.3d at 1583). IBG's proposed construction is simply at odds with the claim terms and therefore the Court will give the terms their plain and ordinary meaning.

IV. **"program code" ('132 Patent; claims 8, 36, 51) ('304 Patent; claim 27) ('996 Patent; claims 1, 14, 15, and 16)**

| IBG's Proposed Construction | TT's Proposed Construction |
|---|---|
| Section 112(6) means-plus-function; the patent fails to describe corresponding structure for the functions | Section 112(6) does not apply, but even if it does, the claims provide corresponding structure for the functions disclosed. |

The parties dispute regarding "program code" is more fundamental than the prior terms and requires the Court to first address the threshold question of whether these terms are means-plus-function terms and consequently 35 U.S.C. § 112(6)

applies. If § 112(6) does not apply, no further construction is necessary. However, in the event these terms are governed by § 112(6), the next step of the inquiry is whether the requisite structure is disclosed in the patents. § 112(6) provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"To determine whether § 112, para. 6 applies to a claim limitation, our precedent has long recognized the importance of the presence or absence of the word 'means.'" *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348 (Fed. Cir. 2015). Indeed, "the failure to use the word 'means' also creates a rebuttable presumption…that § 112, para. 6 does not apply." *Id.* In short, "the essential inquiry" is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* The presumption against means-plus-function is overcome where "the challenger demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (quoting *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880 (Fed. Cir. 2000)).

Here, the "program code" claim terms do not use "means" or "means for" and therefore IBG bears the burden of overcoming the presumption against means-plus-function claiming. IBG fails to do so. Again, "program code" is a claim term that has been construed by Judge Moran in previous litigation. *eSpeed,* 2006 WL 3147697 at *12. And while this is certainly not mandatory authority, the prior analysis and

construction is persuasive and equally apt here[1]. In the *eSpeed* litigation, Judge Moran found that "program code" was not subject to means-plus-function restrictions. *Id* at *13 ("Because we begin with the presumption that claim 8 is not a means-plus-function claim, and because defendants GL and FuturePath have failed to rebut that presumption, we find that claim 8 does not come within the ambit of § 112, ¶ 6."). In doing so, the court relied, in part, upon how "code" was defined in technical dictionaries. "The term 'code,' with regard to computer technology, is designed as: 'In software engineering, computer instructions and date definitions expressed in a programming language or in a form output by an assembler, compiler, or other translator.' *Id.* (quoting THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS, FIFTH ED. (1993)). For its part, TT cites an additional three dictionary definitions in its brief to demonstrate the common understanding of "program code" designates sufficient structure. *See* TTAppx7; TTAppx11; TTAppx16.

Apart from Judge Moran's ruling, the context of the claim term language weighs against means-plus-function claiming. Reading "program code" in isolation removes additional claim language which would otherwise suggest that plain and ordinary meaning construction is sufficient. For instance, "program code" is found in conjunction with:

---

[1] Importantly, Judge Moran's claim construction ruling came at a time where, in the absence of "means" in a claim, there was a *strong* presumption against means-plus-function claiming. The Federal Circuit abandoned the strong presumption in *Williamson* but made clear that the presumption against means-plus-function claiming still stands. *Williamson,* 792 F.3d at 1349. Nowhere in Judge Moran's opinion did he reference a strong presumption, nor is there any indication that had the applicable standard been "just" a presumption, as opposed to a strong one, that the outcome would have been any different. Regardless, this Court's construction of "program code" would stand.

- setting a preset parameter for the trade order…

- displaying market information relating to and facilitation trading of a commodity…

- receiving market information for a commodity from an electronic exchange…

- canceling the trade order in response to a subsequent single action of the user input device…

*See* (Dkt. 1114, pgs. 3-4). With this context in mind, a person of ordinary skill in the art could adequately discern that "program code" is not merely a nonce word but does claim sufficient structure. *See* (Dkt. 1075-1, ¶¶ 88-95). Indeed, nearly identical claim terms such as "program" and "user interface code" have similarly been found to be outside the scope of § 112(6). *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1009 (Fed. Cir. 2018) ("The district court thus erred by effectively treating 'program' and 'user interface code' as nonce words and concluding in turn that the claims recited means-plus-function limitations."). The Court sees no meaningful distinction between "program code" here and those similar claim terms at issue in *Zeroclick*. IBG has failed to carry its burden in overcoming the presumption against means-plus-function claiming in the face of clear claim language and relevant authority from the Federal Circuit. Therefore, the "program code" terms do not invoke § 112(6) and no construction is necessary.

## V. "parameter setting component for setting" and "trade order sending component for receiving" ('132 Patent; claim 14)

| IBG's Proposed Construction | TT's Proposed Construction |
|---|---|
| Indefinite; alternatively, section 112(6) means-plus-function; the patent fails to describe corresponding structure for the following functions:<br>• Setting a preset parameter for the trade order . . .<br>• Receiving a command as a result of a . . . selection of the area in the order entry region . . . | Definite; Section 112(6) does not apply, but even if it does, the claims provide corresponding structure for the functions disclosed. |

IBG next challenges the term "component" as used in claim 14 of the '132 Patent. Primarily, IBG asserts that the term is fatally indefinite. Alternatively, IBG claims that the term is a means-plus-function term, within the confines of § 112(6), and does not sufficiently identify structure. An infringer challenging claims as being indefinite has "the burden of proving indefiniteness by clear and convincing evidence." *United Access Technologies, LLC v. AT&T Corp.,* 757 Fed.Appx. 960, 969 (Fed. Cir. 2019). Generally, "[c]laims are invalid for indefiniteness if, when viewed in light of the specification and the prosecution history, they 'fail to inform, with reasonably certainty, those skilled in the art about the scope of the invention.'" *Id.* (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014)). "Merely claiming broadly does not render a claim insolubly ambiguous, nor does it prevent the public from understanding the scope of the patent." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,* 587 F.3d 1339, 1352 (Fed Cir. 2009).

Under either of its positions, that the claim term is indefinite or that the term is claiming means-plus-function, IBG bears the burden. Under both, IBG fails to do

so for overlapping reasons. Similar to the "program code" terms before, IBG frames their objection too narrowly by focusing strictly on the word "component" in the claim term language. By itself, "component" is indefinite as a nonce word. *See* MPEP § 2181(I)(a) ("The following is a list of non-structural generic placeholders that may invoke 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, paragraph 6: 'mechanism for,' 'module for,' 'device for,' 'unit for,' 'component for,' 'element for,' 'member for,' 'apparatus for,' 'machine for,' or 'system for.'"); *Mynette Techs., Inc. v. United States,* 139 Fed. Cl. 336, 366 (2018). However, reading "component" in isolation would impermissibly restrict the analysis here. *Nautilus,* 572 U.S. at 901; *Energizer Holdings v. Int'l Trade Comm'n,* 435 F.3d 1366, 1370 (Fed. Cir. 2006) ("Claim definiteness is analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art."). The full context of the claim language sheds additional light on the scope of the patent. Claim 14 reads:

> A client system for placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, the system comprising:
>
> *a parameter setting component* or setting a preset parameter for the trade order; …
>
> *a trade order sending component for receiving* a command as a result of a selection of the area in the order entry region by a single action of the user input device with a pointer of the user input device positioned over the area, to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

Appx826. Moreover, the patent specification provides additional detail about the structure and scope of the terms in discussing and diagramming the process. *See* Appx819, Appx825; 11:13-20. As drafted, the language of the patent does not give free rein to interpret "component" without guidance. The "component" terms are far from the woefully indefinite category of terms that call for "a value judgment that inherently varies from person to person." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017). Rather, the full context of the claim language, specification, and associated figure provide sufficient guideposts such that a person of ordinary skill in the art would be able to ascertain the scope of the invention with reasonable certainty. (Dkt. 1075-1, ¶¶ 111-113). IBG has not carried its burden in demonstrating that "component" is indefinite by clear and convincing evidence. For the same reasons, IBG fails to overcome the presumption against means-plus-function in the absence of "means" in the claim language and the "component" terms are not subject to § 112(6) because sufficient structure exists.

### VI. "computer readable medium" ('304 Patent; claim 27) ('996 Patent; claim 1) ('411 Patent; claim 26)

| IBG's Proposed Construction | TT's Proposed Construction |
|---|---|
| Indefinite. | Definite. |

Finally, IBG challenges the "computer readable medium" claims as indefinite due to their alleged attempt to claim both an apparatus and a method. Where a claim recites language claiming both an apparatus and a method of using that same apparatus, such claim is indefinite under § 112(2). *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313 (Fed. Cir. 2017). The driving force behind this

rule is the concern that where a patent purports to claim both an apparatus and a method, it becomes unclear to the general public whether infringement occurs at the time the apparatus is developed or rather when that apparatus is actually used. *Id.* However, this does not serve as an absolute bar to an apparatus claim employing functional language or even active verbs. *Microprocessor Enhancement Corp. v. Texas Instruments Inc.,* 520 F.3d 1367, 1375 (Fed. Cir. 2008). Functional claim language is permissible to set the boundaries of what the apparatus is capable of performing. *UltimatePointer, L.L.C. v. Nintendo Co.,* 816 F.3d 816, 827 (Fed. Cir. 2016); *HTC Corp. v. IPCom GmbH & Co., KG,* 667 F.3d 1270, 1277 (Fed. Cir. 2012); *Texas Instruments,* 520 F.3d at 1375.

Here, the '411, '996, and '304 Patent claims claim an apparatus, and an apparatus alone. IBG specifically calls out claim language such as "selecting," "sending," "command," and "setting" as requiring user action separate and apart from the claimed apparatus:

| '411 Claim 26 | '996 Claim 1 | '304 Claim 27 |
|---|---|---|
| *selecting* a particular graphical area in the order entry region *through a single action of the user input device* to both *set a price* for the trade order and *send the trader order* having a default quantity *to the electronic exchange.* | receiving a plurality of commands from a user, *each command sending a trade order to the electronic exchange, . . . wherein each command results from selecting* a particular area in the order entry region corresponding to a desired price level *as part of a single action of the user input device* with a pointer of the user input device positioned over the particular area to both *set an order price parameter for the trade order* based on the desired price level *and send the trade order to the electronic exchange.* | in response to a *selection* of a particular location of the order entry region *by a single action of a user input device, setting a plurality of parameters* for a trade order relating to the commodity and *sending the trade order to the electronic exchange.* |

(Dkt. 1091, pg. 14) (emphasis provided by IBG). IBG's indefiniteness argument might have merit if these claim terms were viewed in a vacuum, but their attempt to sharpen the focus on what it deems to be impermissible action-based claim language

leaves out needed and valuable context. *Energizer Holdings,* 435 F.3d at 1370. For instance, claim 26 of the '411 Patent reads: "A computer readable medium having stored therein instructions for execution by a computer to perform the following method steps: … selecting a particular graphical area…" Appx74-75. The plain language of the patent makes clear that TT was not trying to patent the user's act of "selecting a particular graphical area," but instead that "selecting a particular graphical area" was one of the functional capabilities of the described computer readable medium. This sort of functional and active language does not warrant a finding of indefiniteness. *See UltimatePointer,* 816 F.3d at 827; *HTC Corp.,* 667 F.3d at 1277; *Texas Instruments,* 520 F.3d at 1375.

IBG takes significant issue with TT's claim language because it describes "user-required actions." (Dkt. 1047, pg. 25). However, the claim language's mere mention of user action does not necessarily claim those activities performed by the user. *MasterMine,* 874 F.3d at 1315-16 ("While these claims make reference to user selection, they do not explicitly claim the user's act of selection, but rather, claim the system's capability to receive and respond to user selection."). Indeed, the *MasterMine* court disposed of identical concerns over nearly identical claim language. There, the relevant patent encompassed claim language including active verbiage such as "presents a set of user-selectable database fields," "receives from the user a selection," and "generates a database query." *Id.* at 1315. There the court distinguished *IPXL,* which IBG relies heavily upon, in writing that the claims do not purport to patent the performance of the function, but "merely claim that the system

possesses the recited structure which is capable of performing the recited functions." *Id.* at 1316 (internal quotations omitted). Here, the "computer readable medium" claim terms permissibly use functional language which leave no doubt that any infringement would occur upon the construction of the apparatus and not a user's use of the apparatus. Therefore, the contested language is not indefinite, and the terms will be given their plain and ordinary meaning.

## **CONCLUSION**

For the reasons stated within, the Court construes the disputed terms as detailed above. Additionally, IBG's Motion to Strike is granted. (Dkt. 1124).

_____
Virginia M. Kendall
United States District Judge

Date: December 5, 2019