IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC., ) ) ) *Plaintiff*, ) ) v. ) ) IBG LLC, *et al*, ) ) *Defendants*. ) | No. 10 C 715 Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

TT's Third Amended Complaint accused IBG's BookTrader product of infringing four of its patents: the '304, '132, '411, and '996 patents. (Dkt. 1118). At summary judgment, the Court held that the '411 and '996 patents were patent ineligible and granted partial summary judgment in IBG's favor. (Dkt. 1971). Following a jury trial on the remaining patents, the jury returned a verdict in TT's favor. (Dkt. 2134). The Court entered judgment as follows:

> Jury Deliberations held and completed on 9/7/2021. Jury returns verdict as follows: With respect to Question 1 Infringement; Claims 1, 12, 15, 17, 22, 27 as to '304 Patent For TT; Claims 1, 7, 8, 25, 51 as to '132 Patent For TT: With respect to Question 2 Willful Infringement; Finding for IB: With respect to Question 3 Obviousness; Claims 1, 12, 15, 17, 22, 27 as to '304 Patent For TT; Claims 1, 7, 8, 25, 51 as to '132 Patent For TT: With respect to Question 4 Damages; Finding for TT in the amount of $6,610,985. Enter Judgment. Civil case terminated.

(Dkt. 2131). IBG now moves to correct or, in the alternative, amend the judgment to include the Court's holding that the '411 and '996 patents were invalid. Fed. R. Civ. P. 60(a); 59(e); (Dkt. 2136). [1] TT also moves to amend the judgment to include prejudgment and post-judgment interest.

---

[1] IBG initially moved to correct or amend the judgment to include the disposition of all 10 of the patents TT originally asserted against IBG. (Dkt. 2136). Subsequently, however, IBG narrowed its motion to only the '411 and '996 patents. (Dkt. 2156 at fn. 1).

1

Fed. R. Civ. P. 59; (Dkt. 2137). For the following reasons, IBG's motion is denied and TT's motion is granted in part and denied in part.

## LEGAL STANDARD

A motion filed under Rule 59(e) is one to alter or amend a judgment. Fed.R.Civ.P. 59(e). "A motion to alter or amend a judgment under Rule 59(e) may be granted to correct a manifest error of law or fact." *Duran v. Town of Cicero*, 653 F.3d 632, 642 (7th Cir.2011), citing *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir.2006). Similarly, under Rule 60(a), the "court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a).

## DISCUSSION

**I.    IBG's Motion to Correct or Amend the Judgment**

IBG request the Court correct or amend the judgment to reflect its disposition of the '411 and '996 patents in its favor. Judicial opinions granting partial summary judgment are interlocutory orders that "merge[ ] into a subsequent final judgment." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1311 (Fed. Cir. 2009). For this reason, there is no need to correct or amend the judgment in this case to reflect the Court's prior summary judgment rulings—those decisions are already part of the final judgment. IBG argues "the principle of merger is inapposite because it relates to appellate jurisdiction over interlocutory decision, not to motions to correct or amend a judgment." (Dkt. 2156 at 1). While that is true, the implication of the rule that interlocutory orders are generally only appealable after final judgment is that such orders are considered part of the final judgment. *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 662 (7th Cir. 1998) (Final judgment rule does not '"permit appeals, even from fully

consummated decisions, where they are but steps towards final judgment in which they will merge.'") (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

*Abbot Labs v. Baxter Healthcare Corp.*, cited by IBG, is distinguishable. No. 04 C 836, 2010 WL 3894427, at *3 (N.D. Ill. Sept. 30, 2010). There, the defendant filed its motion for summary judgment prior to filing a counterclaim seeking declaratory judgment that the patent-in-suit is not infringed. *Id*. The court granted summary judgment in defendant's favor on the issue of infringement, but because a request for declaratory judgement was not included in defendant's summary judgment motion, the court did not grant summary judgment as to the declaratory judgment claim. *Id*. Under such circumstances, which the court characterized as "a mistake arising from oversight[,]" the court granted defendant's motion to amend the judgment to include a declaratory judgment that defendant did not infringe the patent at issue. *Id*. Here, there is no mistake or oversight; all of the parties' claims have been accounted for. The claims regarding the '411 and '996 patents were resolved in IBG's favor at summary judgment and the claims regarding the '132 and '304 patents were resolved in TT's favor at trial. IBG's motion is denied.

**II.     TT's Motion to Amend**

TT requests the Court amend the judgment to include an award of prejudgment and post-judgment interest. An award of prejudgment interest is the default rule in patent cases. *See e.g., Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983) ("In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement."); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001) ("[P]rejudgment interest [is] the rule, not the exception."). The Court may, however, decline to award or limit prejudgment interest in certain circumstances, including when the patentee unduly

delays prosecution. *Gen. Motors*, 461 U.S. at 657; *Crystal*, 246 F.3d at 1361. Nonetheless, "[a]bsent prejudice to the defendants, any delay by the patentee does not support the denial of prejudgment interest." *Crystal*, 246 F.3d at 1361–62 (internal quotations and citation omitted).

IBG argues TT unduly delayed prosecution when it waited to bring suit for nearly six years, despite being aware of the infringing BookTrader product in March 2004. IBG presents evidence that TT's decision to delay suit was the result of a litigation decision to go after smaller, direct competitors first before turning to larger brokers such as IBG. (Dkt. 2160 at 3–4) (quoting Trial Transcript at 733, 4138). This decision sent conflicting messages to IBG regarding the infringing nature of its BookTrader product. In 2004, TT published an Open Letter to the futures trading industry informing the industry of its patents and intention to enforce them. (Dkt. 2160 at Ex. D). At the time, IBG perceived the letter, which explicitly mentioned IBG as a competitor, as a threat of suit, but when TT did not pursue litigation year after year, despite pursuing litigation against 18 other competitors in 2004 and 2005, (*id*. at Ex. C), IBG thought TT "was satisfied that we had a moving price axis and we weren't violating its patent." (Dkt. 2167 Ex. C, Nemser Direct at 2756); *see also* (Dkt. 2167 Ex. A, Petterfy Direct at 1929) (Q: So when you didn't hear from TT for six years, what did you think? A: I thought they had looked into our background, realized who we were, and they didn't want to prosecute this any long[er].").

Apart from the accrual of prejudgment interest, however, IBG does not adequately demonstrate how TT's decision to delay suit caused it actual prejudice. *See e.g., Lisle Corp. v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *1 (N.D. Ill. Apr. 7, 2004) (awarding prejudgment interest although patentee waited six years to sue where defendant failed to demonstrate prejudice independent of accrual of prejudgment interest). Accumulation of prejudgment interest will *always* occur where there is *any* delay in prosecution by the patentee. Mere delay, absent

4

prejudice, however, is insufficient to deny a prevailing patentee prejudgment interest. *See e.g., Lummus Indus., Inc. v. D.M. & E. Corp.,* 862 F.2d 267, 275 (Fed. Cir. 1988); *Crystal*, 246 F.3d at 1361. IBG claims that had TT timely informed it of its infringement allegations, "IB could have easily altered BookTrader to design around TT's patents" by switching to an always-centered price ladder like other competitors or by offering BookTrader as a standalone product. (Dkt. 2160 at 4–5). This assertion, however, is undercut by the fact that IBG never altered BookTrader to switch to either of these alleged alternatives even after being sued in 2010.

*Crystal Semiconductor*, cited by IBG, is distinguishable. 246 F.3d at 1361–62. There, the Federal Circuit denied prejudgment interest where the patentee failed to notify the defendant of its patents, despite having determined that defendants' product infringed its patents. *Id.* Notably, the patentee informed 30–40 other companies of its patents but did not notify defendants until bringing suit two years later. *Id.* at 1362. Under these circumstances, the court held that the patentee's two-year "delay was self-serving and resulted in prejudice to the defendants." *Id.* Unlike the patentee in *Crystal Semiconductor*, TT did not attempt to hide its patents from IBG as part of some self-serving litigation tactic. The 2004 Open Letter explicitly mentioned IBG and IBG was aware of the letter, as well as TT's patents. *See* (Dkt. 2160 at Ex. D); (Dkt. 2167 at Ex. A, Ex. C). Moreover, IBG was aware of and followed TT's litigation against other competitors. (Dkt. 2167 Ex. C at 2752–56).

If prejudgment interest were not the default rule in patent cases, the Court might be more swayed by IBG's position, as there was no need, apart from a litigation decision to go after other competitors first, for TT to delay suit against IBG. *See for example*, *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 907 (E.D. Wis. 2017) (limiting prejudgment interest where patentee delayed suit merely due to a litigation decision to sue larger industry players first).

Nonetheless, IBG has failed to demonstrate the sort of bad faith conduct or prejudice warranting variance from this rule. For this reason, an award of prejudgment interest is justified in this case.

The parties also disagree as to the amount of prejudgment interest that should be awarded. Their primary dispute concerns whether the jury's damages award should be characterized as a lump-sum payment, in which case, prejudgment interest applies to the entire amount over the 17-year infringement period, or whether it reflects a running royalty, in which case, prejudgment interest is applied to each reasonable royalty payment IBG would have paid TT based on its use of TT's product.

Both parties' damages experts offered damages opinions based on the reasonable royalty IBG and TT would hypothetically negotiate at the start of the infringement period and their suggested award amounts were tied to actual use or access to the patented invention. (Trial Transcript at 1822, 3273). Both experts relied on the same three comparable agreements, each structured as running royalty arrangement, whereby the licensee would remit royalty payments to TT on a monthly or quarterly basis based on their use of TT's patented invention. (*Id*. at 1676–77, 3352); (Dkt. 2160 at Ex. H–J). Based on the damages testimony offered at trial, it is reasonable to conclude that the jury's award most likely reflects a running royalty amount rather than a lumpsum payment. This conclusion is bolstered by the fact that the jury's damages award exactly matches one of the proposed damages amount offered by IBG's damages expert, who opined that at a reasonable royalty rate of 10 cents per user in the United States, based on the amount of IB customers who actually used BookTrader, the damages amount would be $6,610,985. (Trial Transcript at 3330, 3273).

Based on TT's business practices with other licensees, it is reasonable to conclude that had IBG and TT negotiated a licensing arrangement, IBG would have paid TT royalties on a quarterly

basis [2] based on IBG customers' use of TT's product. (Dkt. 2160 at Ex. H–J, L). Critically, TT would not have received the entire $6,610,985 damages amount in July 2004, because it would not have known how much IBG's customers would use its product over the course of the next 17 years. The purpose of prejudgment interest awards is "to ensure that the patent owner is placed in *as good a position as he would have been in had the infringer entered into a reasonable royalty agreement.*" *Gen. Motors*, 461 U.S. at 655 (emphasis added). To treat the damages award as a lumpsum and charge interest on it over the course of the infringement period would overcompensate TT by awarding it interest on money it would not have yet received. Indeed, the difference in the lumpsum interest award advocated by TT, $7,334,417, and the running royalty interest award advocated by IBG, 2,099,171, is telling[3]. Awarding interest on royalty payments as TT would have received them based on IBG's use of its patented invention is the most accurate way to compensate TT.

Next, while the parties agree that the prime rate should be used to calculate interest, they disagree as to whether the average prime rate or a fluctuating, current prime rate should be used. In this Circuit, "the best starting point is to award interest at the market rate, which means an *average of the prime rate* for the years in question." *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (internal quotations and citation omitted) (emphasis added). While a few courts have veered from this approach by using a fluctuating rate, *see e.g., Ryl-Kuchar v. Care Centers, Inc.*, 564 F. Supp. 2d 817, 829 (N.D. Ill. 2008) (awarding prejudgment interest based "on the monthly prime rate set by the Federal Reserve during the months for which" plaintiff sought interest), the Seventh Circuit has on at least one occasion

---

[2] The transaction date IBG provided to the jury was based on quarterly amounts. (*See* Dkt. 2160 at Ex. E).
[3] These numbers represent prejudgment interest calculated at the average prime rate, compounded monthly up until the date of the Court's original judgment.

suggested that the average rate should be used over a fluctuating, current rate. *First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, fn. 9 (7th Cir. 1999) ("[W]e held that the average prime rate for the entire time period was the appropriate measure, rather than the current prime rate."). Thus, the Court will adhere to the standard approach of utilizing the average prime rate and amend the final judgment to include an award of prejudgment interest on the jury award of $6,610,985 at a rate of 4.413% beginning in July 2004 through the date of this Order, compounded monthly, for a total of $2,122,355. [4]

Finally, IBG does not contest the award of post-judgment interest in this case. Thus, the final judgment is also amended to include an award of post-judgment interest on the jury award of at a rate of 0.07% beginning on September 7, 2021, compounded annually. Post-judgment interest on the pre-judgment interest is also awarded beginning on the date of this Order at a rate of 0.41%, compounded annually. [5]

## CONCLUSION

For the foregoing reasons, IBG's motion to correct or, in the alternative, amend the judgment is denied and TT's motion to amend the judgment is granted in part and denied in part.

_____
Virginia M. Kendall
United States District Judge

Date: January 11, 2022

---

[4] The parties agree that the prejudgment interest owed through the date of the Court's original judgment, September 7, 2021, using the average prime rate, compounded monthly is $$2,099,171. (Dkt. 2160 at fn. 13) (Dkt. 2167 at fn. 2). A daily rate of $184 per day is then applied through the date of the amended judgment, January 11, 2022, to reach a total amount of $2,122,355. (Dkt. 2160 at fn. 13).

[5] The applicable post-judgment interest rate is "equal to the weekly average 1-year constant maturity Treasury yield … for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(b). For the week beginning January 3, 2022, the applicable average rate is 0.41%. *See* Federal Reserve Select Interest Rates, https://www.federalreserve.gov/releases/h15/.